***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before former Deputy Commissioner Jones and the briefs and arguments of the parties. The appealing party has shown good grounds to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in a Pre-Trial Agreement as
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant-employer.
3. Defendant is a duly self-insured and Sedgwick Claims Management Service, Inc., is the servicing agent.
4. Plaintiff's average weekly wage at the time of his injury was $506.40 yielding a compensation rate of $337.60. A Form 60 was entered into by the parties upon which plaintiff received temporary total disability compensation from the date of his injury through April 15, 2001.
5. Plaintiff's medical records were stipulated into evidence as a portion of Stipulated Exhibit 1.
6. Industrial Commission Forms and filings and discovery relating to this case were stipulated into evidence as a portion of Stipulated Exhibit 1.
7. Plaintiff's claim is for a bilateral knee meniscal tear arising out of an accident in the course of his employment, which was accepted by defendant.
8. The depositions of Nicole Lee Becken, P.T., Srobona T. Chatterjee, M.D., John Scott O'Malley, M.D., Charles L. Nance, Jr., M.D. and Julie A. Wilsey have been received and admitted into the evidence of record.
9. The issues are: (i) whether the settlement agreement entered into by the parties but was never approved by the North Carolina Industrial Commission is enforceable; (ii) if not, whether plaintiff is to repay the $25,000.00 paid by defendant; (iii) whether plaintiff has committed fraud in his refusal to repay the $25,000.00 to defendant when he would not enter into the settlement agreement that had been revised at the direction of the North Carolina Industrial Commission; (iv) whether defendant committed fraud and is liable for prosecution by the Industrial Commission for unconscionably negotiating a $25,000.00 settlement check and misleading plaintiff into believing it was a down payment; and (v) whether plaintiff is entitled to a second opinion and change of physician?
 *********** EVIDENTIARY RULINGS
The objections raised in the depositions of Nicole Lee Becken, P.T., Srobona T. Chatterjee, M.D., John Scott O'Malley, M.D., Charles L. Nance, Jr., M.D., are OVERRULED.
 ***********
Based upon the evidence of record the Full Commission makes the following
 FINDINGS OF FACT
1. Plaintiff has two years of college education and can read and write. Plaintiff was in the Army. After he was discharged in 1970, plaintiff went to college for two years. Plaintiff left school to return to work for the White Star Company for three or four years to manage a store. Plaintiff also has worked construction though his work history is sporadic.
2. Plaintiff, at age 50, began his employment with defendant-employer on June 19, 2000 when he was hired to be a fireman/maintenance worker and worked a twelve a.m. to eight a.m. shift.
3. On July 23, 2000, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer when he jumped from the deck of a fire truck and twisted both of his knees.
4. Plaintiff was examined by Charles L. Nance, M.D., on July 25, 2000 and Dr. Nance believed plaintiff had a traumatic effusion of the left knee and aspirated the left knee. An MRI of the right knee revealed a small lateral meniscal tear. An MRI of the left knee indicated a medial meniscal tear with medial compartment narrowing.
5. On September 22, 2000, plaintiff was examined by John S. O'Malley, M.D., as a result of his continued pain. Dr. O'Malley recommended a bilateral knee arthroscopy procedure, which was performed on September 27, 2000.
6. On October 16, 2000, plaintiff was released to return to work with restrictions of sedentary work. Plaintiff returned to work on December 6, 2000 but could work only four hours a day with restrictions to light-duty activities.
7. Plaintiff was unable to perform his normal duties upon his return to work. Since plaintiff had been hired as a member of the airport's emergency response team, which is an "essential position", plaintiff's being out of work created staffing problems for defendant-employer.
8. When it seemed as if plaintiff was not going to be able to fill his position for a period of time and the response team was reduced to one person, a determination was made that the position needed to be filled. Defendant-employer terminated plaintiff on December 15, 2000 prior to plaintiff being released by his treating physician.
9. Employees for defendant-employer are subject to a six month trial period of employment. During the six months the new employees do normal duties and at the completion of that time, the employees are evaluated by the supervisor to determine whether or not they are compatible with the employment.
10. Plaintiff continued to have complaints and was treated by Dr. O'Malley.
11. A functional capacity evaluation was performed by Nicole Lee Becken, P.T. on February 6, 2001. While she recorded in the results of the functional capacity evaluation that plaintiff was able to work in the medium work category, Therapist Becken testified that she had initially misread the Department of Labor Standards and that plaintiff actually qualified to work in the heavy work category.
12. Dr. O'Malley relied on the written report of the functional capacity evaluation in determining plaintiff could return to work at medium capacity. He relied on the functional capacity evaluation for the criteria of the medium capacity work. Thus, by inference, if the report had been corrected to accurately reflect plaintiff's capacity to work in the heavy work category, Dr. O'Malley would have made that same determination.
13. Dr. O'Malley released plaintiff from his care, rated plaintiff with five (5%) percent permanent partial disability for each leg and indicated plaintiff could return as needed after February 9, 2001 for treatment. However, plaintiff did not return until September 5, 2002 after retaining counsel.
14. After February 9, 2001 plaintiff sought treatment from the Veteran's Hospital of Durham for breathing problems, complaints of joint pain and occasional complaints of knee pain.
15. Although plaintiff was determined to be permanent and totally disabled by the Veteran's Administration, this finding is not binding on the Industrial Commission. Further, it appears that in finding plaintiff permanently and totally disabled, the Veteran's Administration relied on a statement by plaintiff that he had been terminated from work due to the severity of his injury. This representation is inaccurate. Julie A. Wilsey, the deputy director at the Wilmington airport and the supervisor of the maintenance department, indicated that plaintiff was terminated because according to the airport regulations, it was necessary to have a person in his position who could perform all the duties. His restrictions of light duty limited to four hours per day in December 2000 prevented him from performing his duties as a member of the emergency response team. Further, as of February 9, 2001, plaintiff was released to at least medium level work by Dr. O'Malley and none of plaintiff's treating physicians have stated that he is incapable of returning to work.
16. The greater weight of the evidence is that any disability plaintiff had subsequent to February 9, 2001 was unrelated to his employment with defendant. However, he was paid temporary total disability compensation until April 15, 2001.
17. Following a mediation settlement conference, plaintiff entered into a settlement agreement or contract with defendant-employer on April 2, 2001. The terms of the agreement provided plaintiff was to be paid $25,000.00 as a full settlement of his claim. Both parties signed this agreement.
18. After plaintiff signed the settlement agreement but before the settlement agreement was approved by the Industrial Commission, defendant forwarded a $25,000.00 check dated May 9, 2001 which plaintiff endorsed and cashed.
19. The settlement agreement was submitted to the Industrial Commission for approval. On May 23, 2001 Chief Deputy Commissioner Stephen Gheen entered an order requesting additional information regarding plaintiff's age, educational level, past work experience, past vocational training and any impairment, physical, mental, or emotional which predates the current injury. Chief Deputy Gheen ordered that the parties either resubmit a revised settlement agreement or provide the needed information.
20. Defendant added the additional requested information in a revised settlement agreement and resubmitted the settlement agreement for plaintiff to sign. Although these additional facts only assist the Commission in determining fairness and justice and do not represent any change in the material terms of the contract, which forms the basis of the settlement agreement, plaintiff refused to sign the revised settlement agreement. The requested information reflected: plaintiff was 51 years of age; he had completed two years of college; has had work experience in home repair and remodeling; has no past vocational training and has no physical, mental or emotional impairments which predate his injury.
21. Plaintiff claimed he believed the $25,000.00 was merely a down payment on a future settlement and did not understand the settlement agreement. His testimony is not accepted as credible. While initially plaintiff denied at the hearing before the deputy commissioner that he signed the original settlement agreement, he later admitted that he had signed the agreement for final settlement and release and that the document clearly stated he was settling this claim for $25,000.00.
22. Having considered both the original settlement agreement signed by plaintiff on April 2, 2001 as well as the supplemental information provided in the form of a revised settlement agreement, the Full Commission determines that the agreement is fair and just to all parties and in the best interest of all parties.
23. Neither party has committed fraud.
 ***********
The foregoing findings of fact and conclusions of law engender the following additional
 CONCLUSIONS OF LAW
1. On July 23, 2000, plaintiff sustained a compensable injury by accident to both of his knees arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. As a result of his compensable injury by accident, plaintiff has received temporary total disability compensation from July 23, 2000 through April 15, 2001 at a rate of $337.60. N.C. Gen. Stat. § 97-29.
3. Compromise settlement agreements are governed by general principles of contract law. Chapell v. Roth, 353 N.C. 690,692, 548 S.E.2d 499, 500,rehearing denied, 354 N.C. 75, 553 S.E.2d 36 (2001). "It is a well-settled principle of contract law that a valid contract exists only where there have been a meeting of the minds as to all essential terms of the agreement." Northington v. Michelotti, 121 N.C. App. 180, 184,464 S.E.2d 711, 714 (1995). A meeting of the minds occurred when the parties entered into a compromise settlement agreement at a mediation settlement conference on March 21, 2001, which was then reduced to writing and signed by plaintiff on April 2, 2001. Therefore a binding contract was formed when plaintiff settled his claim for the consideration of $25,000.00. Lemly v. Colvard Oil Company,157 N.C. App. 99, 577 S. Ed.2d 712 (2003).
4. Considering the terms of the original settlement agreement signed by plaintiff on April 2, 2001 and the additional information requested which was submitted in the form of the revised unsigned agreement, the Full Commission determines that the terms of the agreement are fair and just to all parties and in the best interest of all parties. Thus, the settlement agreement is final with regard to plaintiff's claim in full, final and complete satisfaction of any and all claims under the Workers' Compensation Act which plaintiff may have against the employer now or in the future by reason of the July 23, 2000 accident. NCIC Rule 502.
5. Even assuming arguendo, if the Full Commission had found that the compromise settlement agreement was not fair and just, plaintiff has not presented evidence sufficient to support a finding that he is or has been disabled from working as a result of the incident of July 23, 2000 after February 9, 2001 when he was released to at least medium level work. Therefore, since plaintiff would not be entitled to further payment of temporary total disability compensation and, in fact, was overpaid in the amount of $3,183.09 for the period paid subsequent to February 9, 2001 until April 15, 2001, defendant would be entitled to this amount. Further, plaintiff would be entitled to payment of $6,752.00 (twenty weeks times $337.60) for his permanent partial disability rating of five percent to the right knee and five percent to the left knee. However, since defendant prematurely paid $25,000.00 to plaintiff, defendant would be entitled to an offset of $6,752.00 against the $25,000.00. N.C. Gen. Stat. §§ 97-29, 97-31(15) and 97-42.
6. Neither party has committed fraud in this matter. N.C. Gen. Stat. § 97-88.2.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 ORDER
1. The compromise settlement agreement signed by plaintiff on April 2, 2001 in conjunction with the supplemental information provided is fair and just to all parties and is therefore, APPROVED.
2. Both sides shall be responsible for their costs.
This the 11th day of March 2004.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER